IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   12-cv-00253-WYD-KMT

DANIELLE RICE,

>      Plaintiff,

v.

DELOITTE CONSULTING LLP,

>      Defendant.

---

## ORDER ON SUMMARY JUDGMENT

---

I.      <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendant Deloitte's Motion for Summary

Judgment filed January 25, 2013.  A response in opposition to the motion was filed on

February 19, 2013, and a reply was filed on March 27, 2013.  For the reasons stated

below, Defendant's Motion for Summary Judgment is granted in part and denied in part.

By way of background, this is an employment case.  Plaintiff Danielle Rice

("Plaintiff") is a transgender woman who claims that she was discharged from her job as

a Senior Manager at Deloitte Consulting, LLP's ["Deloitte"] because of her status as a

qualified individual with a disability and because of her sex, specifically her failure to

conform to Defendant's preferred gender stereotypes.  Plaintiff asserts that she was

targeted by Deloitte from the moment it bought out her previous employer,

BearingPoint.  Deloitte contends that Plaintiff was discharged from her job because of

poor job performance, and that it is entitled to summary judgment on both of Plaintiff's claims.

As grounds for its summary judgment motion, Deloitte argues that Plaintiff's complaint is barred by the statute of limitations because Plaintiff did not file her EEOC Charge until May 26, 2011—more than 300 days after she was notified of her termination on June 9, 2010.  Deloitte also argues that Plaintiff's disability claim fails as a matter of law because she was not disabled at the time Deloitte made the decision to place her on a performance improvement plan ["PIP"] and terminate her employment. Finally, Deloitte argues that Plaintiff's gender stereotyping discrimination claim and disability claim fail because she fails to meet her burden of showing that Deloitte's legitimate reasons for terminating her employment are false or a pretext for discrimination.  I address these arguments below, including where pertinent the facts relevant to the arguments.  While I did not address herein all the facts, I have considered the entirety of Deloitte's statement of material facts, Plaintiff's response to Deloitte's facts and statement of additional disputed facts, and Deloitte's reply concerning its facts and response concerning Plaintiff's additional facts.

II.      ANALYSIS

A.      Whether Plaintiff's Claims Are Barred by the Statute of Limitations

Plaintiff has 300 days to file an EEOC Charge after she knows or should have known of the allegedly unlawful employment practice.  *Delaware State Coll. v. Ricks*, 449 U.S. 250, 257 (1980).  In determining when the statute of limitations begins, the focus is not on the employee's last day of work or the day on which the termination is

effectuated.  Instead, the focus is on the date that the employee is informed of the

allegedly discriminatory decision.  *Id.*  After that date, "[m]ere continuity of employment,

without more, is insufficient to prolong the life of a cause of action for employment

discrimination.  *Id.*; *see also Almond v. Unified School Dist. No. 501*, 665 F.3d 1174,

1177 (10th Cir. 2011).

Deloitte contends that Plaintiff was told on June 9, 2010, that it had been decided

that she would not be allowed to continue on her PIP, that her employment with Deloitte

was not working out, that she and Deloitte needed to part ways, and that it was time to

discuss the terms of her separation.  (Mot. Summ. J. ("Mot."), Ex. D, Rice Dep.

[hereinafter "Rice Dep."] 209:11-210:16.)  Deloitte also points out Plaintiff's testimony

that she was notified on June 9, 2010, that her employment was terminated:

> Q:      So Wednesday, June 9th you talked to Mr. Van Den Eynde?
>
> A:      Yes.
>
> Q:      And did you guys go through the performance evaluation? What did you talk  about?
>
> A:      Not in detail.  He – I was about to discuss the evaluation in my response, and he cut me off.  He just said, Danielle, I know you've made progress on your PIP, but *this isn't working out, and we need to discuss terms of parting ways.*
> And I said to him, Well, I completed – you know I'm in the middle of my PIP. I'm completing – I successfully completed the oral communications workshop, and I still have the writing communications workshop to do.
> He goes, Well, it's best to – *that we discuss terms of separation.* We'll talk about it next week.  And that's the way the conversation ended.  It was very short and to the point.
>
> Q:      Okay.  So it seemed pretty clear to you at that point that Deloitte had determined that the relationship between you and them was not going to work out, that you needed to separate from employment?

A:      *That's – I was informed of that basically, no, I wasn't being allowed to continue on my PIP, and he wasn't giving me any options.*

Q:      Did he say who had made the decision?

A:      No.

Q:      Just that Deloitte had decided that?

A:      *He said it had been decided.*

(Rice Dep. at 209:11–210:16) (emphasis added.)  The next day, on June 10, 2010, Plaintiff had a heart attack and went on medical leave for eight months. Although she remained on payroll until March 7, 2011, she performed no work for Deloitte from June 14, 2010 forward.

      I find despite the foregoing evidence that Defendant's summary judgment motion must be denied as to the argument that Plaintiff's claim is time-barred, as there are genuine issues of material fact as to this issue.  First, while not dispositive of the issue, Plaintiff's termination letter is dated March 7, 2011, and states that her "last day in the office providing services to [Deloitte] shall be March 07, 2011."  (Pl.'s Resp. Mot. Summ. J. ["Resp."], Ex. 15.)  More importantly, Mr. Van Den Eynde testified that while the June 9, 2010 conversation he had with Ms. Rice involved "discuss[ing] parting ways," he also stated "when she came back in January [of 2011], that conversation was to talk about *how difficult it was going to be to try and transition and stay – and be successful in the practice in the next year.*"  (Resp., Ex. 2, Van Den Eynde Dep. 71:5-23.)  Thus, even if there was a discussion regarding the parting of ways in June 2010, there is a reasonable inference to be drawn from the above that when Plaintiff came back in

January of 2011, there had not yet been a final decision about Plaintiff's termination.

Mr. Van Den Eynde also acknowledged in his deposition that Deloitte terminated Ms.

Rice's employment on March 7, 2011.  (*Id.* at 72:14-73:19.)

Further, throughout the course of the proceedings in the EEOC, Deloitte

conceded that her employment was not terminated until March 7, 2011.  In fact, Deloitte

acknowledged during those proceedings that after June 9, 2010 (and after Plaintiff had

already gone out on medical leave), the Senior Manager performance reviews took

place.  (Resp., Ex. 20, Deloitte's Position Statement at 6.)  Based on Plaintiff's review,

Deloitte stated that a conclusion was reached at the fiscal year-end 2010 consensus

meeting "that Ms. Rice was not going to be successful at Deloitte Consulting, and

separation from employment was *likely the next step.*"  (*Id.*) (emphasis added).[1]

Deloitte further acknowledged that Plaintiff was told in February 2011 that "it would be

difficult to come back from a '5' performance rating, but nonetheless she would be given

the opportunity if she wanted to try."  (*Id.)*  According to Deloitte, Plaintiff "was given the

rest of the week to consider the choices given to her of termination with severance or a

'last chance' opportunity", and that Plaintiff advised on February 28, 2011 "that she

would transition from Deloitte."  (*Id.* at 7.)[2]

---

[1]  Deloitte acknowledged therein that this performance feedback was not provided to Plaintiff she
returned to work in 2011.  (*Id.*)  Plaintiff thus correctly points out that she was not on notice of any
decisions made in or as a result of that Performance Review until 2011.  (Resp., Ex. 1, Rice Dep. 221:12-
24.)

[2]  Also, on June 17, 2010, Kelly Connelly, a Talent Manager at Deloitte, sent Ms. Rice an email
stating that Ms. Rice was "eligible for a medical leave" if she needed it.  (*Id.*, Ex. 16.)  And on February 3,
2011, Cassandra Larkin of Deloitte sent Ms. Rice an email welcoming her back from her medical leave.
(*Id.*, Ex. 17.)

Based on the foregoing, I deny Defendant's Motion for Summary Judgment as to the argument that Plaintiff's claims are barred by the statute of limitations.

B.      Whether Summary Judgment is Proper as to Plaintiff's Disability Discrimination Claim

Defendant also argues that Plaintiff's claim for disability discrimination fails as a matter of law because she was not disabled at the time Deloitte made its decision to terminate her employment on June 9, 2010.  That is because Plaintiff did not have her heart attack until June 10, 2010.  This argument is also denied because I found in the previous section that there are genuine issues of material fact as to whether Plaintiff was terminated on June 9, 2010, or at some later date in 2011 after her heart attack occurred.  If Plaintiff was terminated in 2011, I find that her disability discrimination claim is viable for purposes of summary judgment, as Deloitte did not contest Plaintiff's ability to meet the other elements of a prima facie case of disability discrimination.

Defendant also argues, however, that summary judgment is appropriate as to the disability discrimination claim because Plaintiff cannot show that Deloitte's legitimate business reasons for her discharge were false or a pretext for discrimination.  I also deny summary judgment as to this argument, as it was raised for the first time in the reply.  Accordingly, it is waived.  *See Alcohol Monitoring Sys. v. Actsoft, Inc.*, 682 F. Supp. 2d 1237, 1242 (D. Colo. 2010) (finding that argument was waived because it was not raised in the original motion, and noting that under the law of the Tenth Circuit a party generally may not raise an issue for the first time in a reply brief) (citing *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n. 7 (10th Cir. 2009)).

As Judge Brimmer noted in the *Actsoft* case:

> The rationale underpinning this rule is tied to the fact that a responding party
> to a motion ordinarily does not have an opportunity to respond to a reply   .
> . . . Therefore, allowing a party to raise an issue for the first time in a reply
> brief would prevent the responding party from presenting a counter-argument
> and force the Court to decide a potentially contentious issue without the
> benefit of the opposing perspective.

682 F. Supp. 2d at 1242 (internal quotation omitted).  While I acknowledge that  this rule

is not set in stone, Deloitte did not provide any reason for not raising this issue in its

original motion.  It very clearly could have been raised in the motion, and I find that the

failure to do so is a waiver of the argument.

Moreover, even if the argument had not been waived, I find that Plaintiff has

presented evidence of pretext.  While Deloitte asserts that she was fired for

performance reasons, she was given an "on track to meet or exceed goals"

performance review in August 2009 and received two awards for her performance in the

Spring of 2010.  While Deloitte asserts that all former BearingPoint employees were

given an "on track" rating for their July 2009 reviews and that the awards Plaintiff

received were given to everyone who staffed the project, the fact remains that Plaintiff

did receive a positive review and awards.[3]

Plaintiff also points out that Mr. Van Den Eynde sought out only negative

feedback regarding her performance, and ignored positive feedback that was given

---

[3]  Further, when Mr. Van Den Eynde was asked in his deposition whether an employee who was
not on track to meet goals would receive a rating of "on track" anyway, he answered "no."  (Resp., Ex. 2,
Van Den Eynde Dep. 55:16-56:10.)

him.[4]  Finally, when Plaintiff planned to return to work in 2011 after her medical leave,

Mr. Van Den Eynde told her he was concerned that the level of stress she was going to

take on by coming back to work would exacerbate her heart condition.  (Resp., Ex. 2,

Van Den Eynde Dep. at 71:24-72:6.)  Her employment was terminated shortly

thereafter.  *See Jones v. Okla. City Public Schs.*, 617 F.3d 1273, 1280 (10th Cir. 2010)

(evidence of pretext sufficient when plaintiff shows "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

reasons for its action that a reasonable factfinder could rationally find them unworthy of

credence. . . .'") (quotation omitted).

> C.     Whether Summary Judgment is Proper as to Plaintiff's Gender
>         Stereotyping Claim

Finally, Defendant argues that summary judgment should be granted as to

Plaintiff's gender stereotype discrimination claim.  I note in that regard that Plaintiff was

born in 1954 as a biological male.  In 1985, she married and had three children.  In

1991, she divorced and began transitioning her gender identity from male to female.  In

November 1994, Plaintiff had sex reassignment surgery.  She has identified herself as

female for over 20 years.

A claim of gender stereotype discrimination "has its roots in the landmark Title VII

case, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268

---

[4]  The emails Mr. Van Den Eynde solicited noted that Plaintiff "has a strong history leading pursuit efforts" such as the one she led with United Concordia (Resp., Ex. 6); that Plaintiff "is doing very good work and has been very well received by the client" and "is providing strong technology and application delivery expertise in a key area of the program" (*Id.*, Ex. 7); and that she "has done a good job of building relationships and credibility with the BSC IT management, development and testing teams by leveraging her vast delivery experience and the client seems to like her and value her work") (*Id.*, Ex. 8).

(1989)." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 689 F.3d 458, 462 (5th Cir. 2012). In *Price Waterhouse*, "Ann Hopkins alleged that she had been denied partnership in her accounting firm because some of the partners felt, in words attributed to them, that she was 'macho,' needed 'a course at charm school,' and should 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" *Boh Bros. Const. Co.*, 689 F.3d at 462 (quoting *Price Waterhouse*, 490 U.S. at 235). "In explaining how those words might evince discrimination because of sex, a plurality of the Court stated that 'an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.'" *Id.* (quoting *Price Waterhouse*, 490 U.S. at 250.)  The Court "agreed that such comments were indicative of gender discrimination and held that Title VII barred not just discrimination because of biological sex, but also gender stereotyping—failing to act and appear according to expectations defined by gender." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (citing *Price Waterhouse*, 490 U.S. at 250-51).

Since the *Price Waterhouse* decision, courts have held that gender stereotyping can violate Title VII when it influences employment decisions.  Sex stereotyping based on a person's gender non-conforming behavior has been held to be "impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender nonconformity." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004).  "In a sex stereotyping claim, the plaintiff must show that the employer

discriminated against her based on her 'failure to conform to stereotypical gender norms.'"  *McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 711 (10th Cir. 2012).

I agree with Defendant that Plaintiff has failed to present evidence that shows or supports a reasonable inference that Deloitte discriminated against her in its termination decision based on her failure to conform to stereotypical gender norms. Plaintiff was not criticized for not being more feminine, as in *Price Waterhouse*.  Instead, the criticisms of Plaintiff's performance are directed at her unprofessional appearance, poor writing skills, and poor verbal communications and client interactions.  (Resp., Exs. F-L.)

For example, Plaintiff was criticized as to the quality of her "[o]ral presentations (Powerpoint format)", as "the document lacked a story, flow and missing key content" and "the visual (professional) quality was poor."  (*Id.*, Ex. H.)  Plaintiff was noted to have "clearly struggled" throughout her presentation—her delivery was said to be "weak" and on one occasion she was noted to have "interjected relatively forcefully with an irrelevant comment."  (*Id.*)  Plaintiff was also criticized for negative client interactions, calls that were poorly run and lacked focus when she was lead senior manager, struggles with the materials or "a tendency to ramble", or that her proposal documents were "very poor", requiring other senior managers "to do most of the heavy lifting" or "to drive" the overall effort.  (*Id.*, Exs. I-L.)  Exhibit I, an interoffice email, concluded, "Overall, very poor performance and <u>significantly</u> below SM level expectations."  (*Id.*) All of the above criticism examples are, however, gender neutral, and do not support a claim of discrimination based upon failure to conform to a gender stereotypes.  *See*

*Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 225 (1st Cir. 2012) ("By definition, terms that convey only gender-neutral meanings", even if unflattering, "are insufficient to anchor a gender-stereotyping claim."); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (concluding that employer's description of a female employee as "nice" and "nurturing" could not support a gender-stereotyping claim the words as those "are simply not qualities that are stereotypically female").

Plaintiff also, however, points to alleged discriminatory remarks about her gender presentation and asserts that Deloitte's employees "were consistently concerned about her appearance." (Resp. Br. at 2 ¶ 2.) In that regard, an email from Brian Keane to Mike Van Den Eynde in November 2009 stated that Plaintiff was "lack[ing] any shred of Professionalism. From unruly hair to a style of dress that appeared disheveled. The impact was so great that Alan and I debated asking her not to attend [a client meeting] - in the end we decided to dramatically limit her speaking time." (Mot., Ex. H.) In another email, concerns were noted about Plaintiff being "unique/odd in her mannerisms, style and interactions. . . ." (Resp., Ex. 8.)

I agree with Deloitte that while these emails did criticize Plaintiff's appearance, the criticisms appear to be directed at a concern of a lack of professionalism rather than the failure to be more feminine or conform to a gender stereotype. Moreover, the references to unruly hair, a disheveled style of dress or being unique/odd in mannerisms, style and interactions can be attributed to anyone—male or female. While these comments may be unflattering, they are gender neutral and do not support a reasonable inference that Deloitte terminated Plaintiff because of her gender or

because of failed gender stereotype expectations.  Moreover, there is no evidence that the persons who wrote the above emails were involved in any way in the decision to terminate Plaintiff.

Plaintiff also points to her deposition wherein Deloitte Senior Manager Jason Bergstrom referred to her using male pronouns during a conference call.  (Resp., Ex. 1, Rice. Dep. 69:6-70:11).  However, this is not pertinent to her claim that Defendants discriminated against Plaintiff on the basis of a gender stereotype about women.  To the extent this is relevant to her status as a transexual, Plaintiff has not alleged a claim of discrimination on that basis.  Moreover, it does not appear that Mr. Bergstrom was involved in the decision to terminate Plaintiff, and "'Title VII does not prohibit ... offhand comments, and isolated incidents (unless extremely serious).'"  *Morales-Cruz*, 676 F.3d at 225-26 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted).

Finally, Plaintiff refers to testimony of Mr. Van Den Eynde wherein he expected to be "shocked" by Plaintiff's appearance when he met her because she is transgender. (Mot., Ex. 2 – Van Den Eynde Dep. 51:10-52:16.)  Plaintiff misstates his testimony. Mr. Van Den Eynde actually stated that while he was told by one of the partners when Plaintiff came into Deloitte as part of a group that Plaintiff's "look was shocking" and that she was transgender, he "didn't focus at all on the transgender aspects of" Plaintiff and that he "didn't consider her shocking."  (*Id.* 51:13-52:9.)  He further stated that "the transgender piece of this was absolutely not part of the issue or reason for any of the feedback that we were getting", that it "had nothing to do with her look or her sexual

orientation", and that it "was just purely communication styles, her ability to deliver as a senior manager." (*Id.*, 52:10-16).  Thus, Mr. Van Den Eynde's testimony does not support Plaintiff's assertion.[5]

In short, I find that the evidence relied on by Plaintiff as discussed above does not support a reasonable inference that she was terminated or discriminated against for failure to conform to gender stereotypes.  *See Boh Bros. Const. Co.*, 689 F.3d at 459, 462 (holding that there was insufficient evidence that Wolfe 'acted on the basis of gender in his treatment of Woods when the only charge asserted by Wolfe that Woods was other than masculine was when he accused Woods of being girlish because he used "Wet Ones" instead of toilet paper; Wolfe testified that he did not view Woods as feminine, and there is no evidence except the "Wet Ones" that he did, and that does not strike us as overtly feminine"); *Morales-Cruz*, 676 F.3d at 225 (allegations that Plaintiff was described as "fragile," "immature," "unable to handle complex and sensitive issues," engaged in "twisting the truth," and exhibiting "lack of judgment", while "admittedly unflattering", did not support a reasonable inference that the defendants discriminated against the plaintiff "because of failed gender stereotype expectations"; the only gender-specific allegation—that defendants sometimes referred to her as "that girl"—"without more, does not support a reasonable inference of adverse action based on a gender stereotype.").  Accordingly, I grant summary judgment as to this claim.

---

[5]   While Plaintiff asserts that her examples of discrimination constitute direct evidence of discrimination, I reject that argument.  Direct evidence is evidence that "demonstrates on its face that the employment decision was reached for discriminatory reasons."  *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).  "'A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and thus, does not constitute direct evidence.'"  *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007) (quotation omitted).

III.     CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant Deloitte's Motion for Summary Judgment filed

January 25, 2013 (ECF No. 20) is **GRANTED** as to the claim of gender stereotype

discrimination and **DENIED** as to Plaintiff's disability discrimination claim and the

argument that Plaintiff's claims are time-barred.

Dated:  July 9, 2013

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge